United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 3, 1998 Decided March 2, 1999 

 No. 97-1637

 Environmental Defense Fund, 

 on behalf of itself and its members, 

 Petitioners

 v.

 Environmental Protection Agency and 

 Carol M. Browner, 

 in her capacity as Administrator 

 of the United States Environmental Protection Agency, 

 Respondents

 On Petition for Review of an Order of the 
 Environmental Protection Agency

 Robert E. Yuhnke argued the cause and filed the briefs for 
petitioner.

 Thomas A. Lorenzen, Attorney, U.S. Department of Jus-
tice, argued the cause for respondents. With him on the brief 


were Lois J. Schiffer, Assistant Attorney General, Karen L. 
Egbert, Attorney, U.S. Department of Justice, Sara Schnee-
berg, Attorney, Environmental Protection Agency, and Peter 
J. Plocki, Attorney, U.S. Department of Transportation.

 Before: Wald, Williams and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Dissenting opinion filed by Circuit Judge Williams.

 Tatel, Circuit Judge: Petitioner challenges several provi-
sions of the 1997 Final Rule issued by the Environmental 
Protection Agency pursuant to the 1990 amendments to the 
Clean Air Act. That statute prohibits a metropolitan plan-
ning organization from approving and the Department of 
Transportation from funding any transportation project un-
less it comes from a regional transportation plan and program 
that conform to applicable state-level air quality standards. 
Because the challenged "conformity" and "grandfather" regu-
lations allow both local approval and federal funding of trans-
portation projects that satisfy neither this requirement nor 
the single exception the statute permits, we hold that these 
regulatory provisions violate the Clean Air Act. In addition, 
we remand the regulations which allow conformity to be 
based on emissions budgets unapproved or disapproved by 
EPA for further proceedings to harmonize those regulations 
with the statute's general conformity requirements. Finally, 
we hold that the regulation which allows conformity to be 
based on revised budgets that include "safety margin" emis-
sions violates the statute's requirement that conformity be 
evaluated against approved or applicable air quality stan-
dards.

 I

 The Clean Air Act establishes a joint state and federal 
program for regulating the nation's air quality. The Act 
requires EPA to establish National Ambient Air Quality 
Standards ("NAAQS") for various pollutants. See 42 U.S.C. 
s 7409 (1994). It also requires each state to adopt a State 
Implementation Plan (known as a "SIP") that "provides for 
implementation, maintenance, and enforcement of [NAAQS] 

in each air quality control region (or portion thereof) within 
such State." Id. s 7410(a)(1). SIPs must include "enforce-
able emission limitations and other control measures, means, 
or techniques ... , as well as schedules and timetables for 
compliance, as may be necessary or appropriate" to meet the 
NAAQS. Id. s 7410(a)(2)(A). "[A]fter reasonable notice and 
public hearings," each state must submit a SIP with such 
pollution control strategies to EPA. Id. s 7410(a)(1). EPA 
typically approves SIPs pursuant to notice-and-comment rule-
making.

 In 1977, Congress amended the Clean Air Act to ensure 
that transportation planning at the local level conforms to 
pollution controls contained in approved SIPs. To accomplish 
this, the 1977 amendments prohibit federal agencies from 
assisting, approving, or supporting "any [transportation] ac-
tivity which does not conform to [an applicable SIP]." Pub. 
L. No. 95-95, tit. I, sec. 129(b), s 176(c), 91 Stat. 745, 750 
(1977).

 Because Congress "offered little guidance" on the 1977 
conformity requirement, and because federal agencies "large-
ly ... ignored" it, Clean Air Conference Report, 136 Cong. 
Rec. 36,103, 36,105-06 (1990), Congress amended the Act 
again in 1990 to expand the content and scope of this require-
ment. See Pub. L. No. 101-549, tit. I, sec. 101(f), 110(4), 
s 176(c), 104 Stat. 2409, 2470 (1990) (codified at 42 U.S.C. 
s 7506(c)). The focus of this case, the 1990 amendments do 
two things. First, they establish general criteria for deter-
mining whether a transportation activity conforms to a SIP:

 (1) .... Conformity to an implementation plan means--

 (A) conformity to an implementation plan's purpose 
 of eliminating or reducing the severity and number of 
 violations of the national ambient air quality standards 
 and achieving expeditious attainment of such stan-
 dards; and

 (B) that such activities will not--

 (I) cause or contribute to any new violation of any 
 standard in any area;

 (ii) increase the frequency or severity of any exist-
 ing violation of any standard in any area; or

 (iii) delay timely attainment of any standard or any 
 required interim emission reductions or other mile-
 stones in any area.

42 U.S.C. s 7506(c)(1). Heads of federal agencies have "an 
affirmative responsibility" to assure conformity of any feder-
ally assisted or approved activity to an applicable SIP. Id.

 Second, the 1990 amendments integrate the attainment and 
maintenance of air quality standards with the specific trans-
portation planning process prescribed by the Urban Mass 
Transportation Act. As the Clean Air Conference Report put 
it, "[t]he purpose of the new 'conformity' requirement is to 
ensure that the transportation systems choices made by the 
community and incorporated into the regional transportation 
plan required by [federal transportation statutes] are consis-
tent with achieving the allowable emission targets for each 
pollutant assigned to mobile sources in the SIP." 136 Cong. 
Rec. at 36,106 col.2. Under the Urban Mass Transportation 
Act, the governor of each state, in agreement with local 
officials, must designate a metropolitan planning organization 
(known as an "MPO") for each urban area with more than 
50,000 people. See 49 U.S.C.A. s 5303(c)(1). The MPO plans 
for the transportation needs of that area. It develops a long-
range transportation plan (referred to in the statute as a 
"plan") which specifies the facilities, services, financing tech-
niques, and management policies that will comprise the area's 
transportation system over a 20-year period, see id. s 5303(f), 
as well as a short-term transportation improvement program 
(referred to in the statute as a "program" and in the regula-
tions as a "TIP") which identifies and prioritizes the specific 
transportation projects to be carried out over the next three 
years, see id. s 5304(b). The heart of the Clean Air Act's 
1990 conformity requirements consists of the following re-
strictions on approval and funding of transportation plans, 
programs, and projects:

 (2) Any transportation plan or program developed 
 pursuant to Title 23 or the Urban Mass Transportation 
 Act shall implement the transportation provisions of any 

 applicable implementation plan ... applicable to all or 
 part of the area covered by such transportation plan or 
 program. No Federal agency may approve, accept or 
 fund any transportation plan, program or project unless 
 such plan, program or project has been found to conform 
 to any applicable implementation plan in effect under this 
 chapter. In particular--

 (A) no transportation plan or transportation im-
 provement program may be adopted by a [MPO], or be 
 found to be in conformity by a [MPO] until a final 
 determination has been made that emissions expected 
 from implementation of such plans and programs are 
 consistent with estimates of emissions from motor 
 vehicles and necessary emissions reductions contained 
 in the applicable implementation plan ...;

 ....

 (C) a transportation project may be adopted or ap-
 proved by a [MPO] or any recipient of funds designat-
 ed under Title 23 or the Urban Mass Transportation 
 Act, or found in conformity by a [MPO] or approved, 
 accepted, or funded by the Department of Transporta-
 tion only if it meets either the requirements of subpar-
 agraph (D) or the following requirements--

 (I) such a project comes from a conforming plan 
 and program;

 ....

 (D) Any project not referred to in subparagraph (C) 
 shall be treated as conforming to the applicable imple-
 mentation plan only if it is demonstrated that the 
 projected emissions from such project, when consid-
 ered together with emissions projected for the con-
 forming transportation plans and programs within the 
 nonattainment area, do not cause such plans and pro-
 grams to exceed the emission reduction projections 
 and schedules assigned to such plans and programs in 
 the applicable implementation plan.

42 U.S.C. s 7506(c)(2). According to the Agency, these provi-
sions apply only to "nonattainment" areas (i.e., areas that 

have not met an air quality standard for a particular pollu-
tant) and to "maintenance" areas (i.e., former nonattainment 
areas that have met the appropriate standard). See 40 
C.F.R. ss 93.101, 93.102(b) (1998).

 In addition to specifying general conformity criteria and 
imposing restrictions on regional transportation planning, the 
1990 amendments establish conformity criteria that apply to 
transportation plans, programs, and projects prior to Agency 
approval of a submitted SIP. See 42 U.S.C. s 7506(c)(3). 
The amended Act also authorizes EPA to promulgate criteria 
and procedures for determining conformity, provided that "in 
no case shall [conformity] determinations for transportation 
plans and programs be less frequent than every three years." 
Id. s 7506(c)(4)(B)(ii).

 EPA first issued criteria and procedures for making con-
formity determinations in 1993. See 58 Fed. Reg. 62,188 
(1993). It then amended those procedures in a series of 
rulemakings. See 60 Fed. Reg. 40,098 (1995); 60 Fed. Reg. 
57,179 (1995). In recent years, this court has heard two 
challenges to these amended rules. See Sierra Club v. EPA, 
129 F.3d 137 (D.C. Cir. 1997) (invalidating one-year exemp-
tion from statutory conformity requirements for transporta-
tion activities in nonattainment areas); Environmental De-
fense Fund, Inc. v. EPA, 82 F.3d 451 (D.C. Cir. 1996) 
(upholding various regulations as reasonable interpretations 
of the statute).

 In this case, petitioner Environmental Defense Fund ar-
gues that various provisions of EPA's most recent Final Rule, 
see 62 Fed. Reg. 43,780 (1997) (codified at 40 C.F.R. 
ss 93.100-93.128), violate the conformity requirements set 
forth in the 1990 amendments to the Clean Air Act. Specifi-
cally, petitioner contends: (1) that section 93.121(a)(1) of the 
regulations unlawfully permits local authorities to approve 
transportation projects in the absence of a currently conform-
ing transportation plan and program; (2) that section 
93.102(c)(1) suffers from the same defect with respect to 
federal funding of transportation projects; and (3) that sec-


tions 93.118(e)(1), 93.120(a)(2), and 93.124(b) unlawfully re-
quire or permit conformity determinations to be based on 
emissions budgets in SIPs that EPA has disapproved or not 
yet approved.

 Applying Chevron's two-step inquiry, we take up each claim 
in turn. We begin by asking "whether Congress has directly 
spoken to the precise question at issue." Chevron U.S.A. Inc. 
v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 
(1984). If so, "that is the end of the matter; for the court, as 
well as the agency, must give effect to the unambiguously 
expressed intent of Congress." Id. at 842-43. However, if 
"the statute is silent or ambiguous with respect to the specific 
issue," we must defer to the Agency's construction of the 
statute as long as it is reasonable. Id. at 843.

 II

 We start with EDF's challenge to section 93.121(a)(1) of the 
regulations, which provides that an MPO or other recipient of 
federal funds may adopt or approve a regionally significant 
transportation project if "[t]he project was included in the 
first three years of the most recently conforming transporta-
tion plan and TIP (or the conformity determination's regional 
emissions analyses), even if conformity status is currently 
lapsed." 40 C.F.R. s 93.121(a)(1). Conformity status of a 
transportation plan or program lapses when more than three 
years pass without a new conformity determination by an 
MPO or the Department of Transportation. See 42 U.S.C. 
s 7506(c)(4); 40 C.F.R. s 93.104(b)(3), (c)(3). Under section 
93.121(a)(1), local officials may approve a transportation pro-
ject as long as it once appeared in a conforming plan and 
program, even if the plan and program no longer conform at 
the time of project approval. By authorizing this result, 
petitioner argues, section 93.121(a)(1) violates the Clean Air 
Act's requirement that projects "come[ ] from a conforming 
plan and program." 42 U.S.C. s 7506(c)(2)(C). We agree.

 At the outset, we think it important to make clear that this 
dispute over the legality of section 93.121(a)(1) relates only to 


approval of non-federally funded projects. The Agency's rule 
makes clear that local transportation projects receiving feder-
al funds must satisfy a more stringent conformity require-
ment than section 93.121(a)(1). Federally funded projects 
may not proceed unless there exists "a currently conforming 
transportation plan and currently conforming TIP at the time 
of project approval." 40 C.F.R. s 93.114 (emphasis added). 
In other words, during a plan or program conformity lapse, 
an MPO may not find a federally funded project to be in 
conformity, and therefore that project may not go forward. 
The question here is whether non-federally funded projects--
defined as "projects which are funded or approved by a 
recipient of federal funds ... but which do not rely at all on 
any [federal] funding or approvals," 62 Fed. Reg. at 43,788--
may attain conformity status in the absence of a currently 
conforming plan and program.

 We begin with the text of the Clean Air Act. Under 
section 7506(c)(2)(C), an MPO may find a local transportation 
project to conform with an applicable SIP only if the project 
meets one of two requirements: Either it must "come[ ] from 
a conforming plan and program," id. s 7506(c)(2)(C)(i), or its 
"projected emissions..., when considered together with emis-
sions projected for the conforming transportation plans and 
programs within the nonattainment area, [must] not cause 
such plans and programs to exceed the emission reduction 
projections and schedules assigned to such plans and pro-
grams in the applicable [SIP]," id. s 7506(c)(2)(D). Claiming 
that the requirement that a project "come from a conforming 
plan and program" is ambiguous, EPA insists that it has 
reasonably construed this requirement to permit project ap-
proval during a conformity lapse, as long as the project comes 
from the first three years of a once-conforming plan and 
program. This approach, EPA argues, strikes the proper 
balance between protecting air quality and avoiding disrup-
tion to the transportation planning process. According to 
petitioner, the statutory text leaves no ambiguity: A project 
that "comes from a conforming plan and program" means a 
project that comes from a currently conforming plan and 
program. Therefore, EDF argues, the statute prohibits ap-

proval of any projects, federally funded or not, during a 
conformity lapse.

 Giving these words their ordinary meaning, we interpret 
the phrase "comes from a conforming plan and program"--a 
phrase entirely in the present tense--to refer to projects that 
come from a currently conforming plan and program. But 
even were it possible to read the phrase, as EPA and our 
dissenting colleague do, to refer to projects that come from a 
previously conforming plan and program, we think this inter-
pretation is foreclosed by Congress's use of the terms "con-
forming plan and program" in section 7506(c)(2)(D), by the 
general conformity criteria of section 7506(c)(1), and by the 
legislative history of the conformity requirements.

 Section 7506(c)(2)(D) states that a project not included in a 
conforming plan and program may be found to conform only 
if its projected emissions "when considered together with 
emissions projected for the conforming transportation plans 
and programs within the nonattainment area," do not exceed 
the SIP emissions budget. 42 U.S.C. s 7506(c)(2)(D). This 
provision enables a project to attain conformity status "only if 
the regional plans and programs are in conformity at the time 
the project is reviewed." Clean Air Conference Report, 136 
Cong. Rec. at 36,108 col.1. Indeed, in its 1996 notice of 
proposed rulemaking, which led to the Final Rule challenged 
here, EPA acknowledged that

 [t]he option provided in section [7506](c)(2)(D) for new 
 projects that were not previously included in a transpor-
 tation plan/TIP or supporting regional emissions analysis 
 to demonstrate conformity cannot apply during a trans-
 portation plan/TIP conformity lapse, because it requires 
 a demonstration that "conforming transportation plans 
 and TIPs" would still conform when the emissions of the 
 new project are considered. Without a conforming 
 transportation plan and TIP in place, this cannot be 
 demonstrated.

61 Fed. Reg. 36,112, 36,120 col.2 (1996). We thus have no 
doubt that the word "conforming" in section 7506(c)(2)(D) 
means presently conforming. Since section 7506(c)(2)(D) pro-


vides an alternative means of demonstrating project conformi-
ty when a project does not "come from a conforming plan and 
program," it would be quite odd to read the word "conform-
ing" in section 7506(c)(2)(C) to mean something different from 
what it means in section 7506(c)(2)(D).

 Moreover, were we to read the word "conforming" the way 
EPA suggests, then there would be no assurance that pro-
jects approved under section 7506(c)(2)(C) would help elimi-
nate, reduce, or prevent violations of national ambient air 
quality standards, as required by section 7506(c)(1). Accord-
ing to that provision, a "conforming" transportation project is 
one that will contribute to "eliminating or reducing the severi-
ty and number of violations of the [NAAQS] and achieving 
expeditious attainment of such standards," 42 U.S.C. 
s 7506(c)(1)(A), and that "will not--(i) cause or contribute to 
any new violation of any standard in any area; (ii) increase 
the frequency or severity of any existing violation of any 
standard in any area; or (iii) delay timely attainment of any 
standard or any required interim emission reductions or other 
milestones in any area," id. s 7506(c)(1)(B). Though doubt-
ing the applicability of section 7506(c)(1) to projects approved 
under section 7506(c)(2), the dissent nevertheless concedes 
that section 7506(c)(2)(A) expressly incorporates the require-
ments of section 7506(c)(1)(B) and makes them applicable to 
projects approved under section 7506(c)(2). See Dissenting 
Opinion ("Dissenting Op.") at 7. Absent a currently conform-
ing plan and program, there is no certainty that a regionally 
significant transportation project will satisfy any of the sec-
tion 7506(c)(1)(B) conformity criteria. EPA's interpretation 
of section 7506(c)(2)(C) thus eviscerates the requirements of 
section 7506(c)(1)(B) and therefore also the requirements of 
section 7506(c)(2)(A), creating an untenable inconsistency not 
only between section 7506(c)(1) and section 7506(c)(2), but 
also within section 7506(c)(2) itself.

 Our dissenting colleague accuses us of "embrac[ing] an 
argument" raised by petitioner "in two sentences of its 'Sum-
mary of Argument,' but not at all thereafter." Dissenting Op. 
at 4. With all due respect, we think the dissent unfairly 


characterizes petitioner's brief. It is true that petitioner first 
sets forth this argument in the "Summary of Argument":

 The rule ... undermines Congress' decision to ensure 
 that long-term investment of resources in regional trans-
 portation systems contribute to 'eliminating or reducing 
 the severity and number of [NAAQS violations]' (re-
 quired by s 176(c)(1)(A)) by requiring re-assessment of 
 the conformity of the planned regional transportation 
 system every three-years [sic]. 42 U.S.C. 
 s 7506(c)(4)(B)(ii). By allowing projects from a plan that 
 no longer meets regional emission budgets to be ap-
 proved, the rule allows elements of the non-conforming 
 plan to be implemented which can interfere with prog-
 ress toward attaining the NAAQS.

EDF Br. at 13 (alteration in original). But far from failing to 
mention this argument later in its brief, petitioner devotes 
three pages of its "Argument" section to developing the claim. 
See id. at 23-25. EDF opens this discussion by citing section 
7506(c)(4)(B)(ii) for the proposition that "conformity determi-
nations for a plan and/or program expire at least every three 
years by operation of law." Id. at 23. It then argues that 
"[t]he three-year limit on transportation plans and TIPs plays 
an important role by assuring that plans and TIPs continue to 
reflect the latest emission targets for a region," specifically 
mentioning emission reduction targets related to statutorily-
prescribed ozone and carbon monoxide attainment goals. Id. 
at 24. "Without the obligation to renew conformity findings 
every 3 years," EDF concludes, "regions could continue im-
plementing transportation systems designed to meet older 
emission targets no longer adequate to attain the NAAQS." 
Id. In addition to paraphrasing the claim first stated in the 
"Summary of Argument," which explicitly invokes section 
7506(c)(1), this last sentence plainly manifests petitioner's 
belief that EPA's rule fails to ensure that transportation 
plans, programs, and projects will help "achieve expeditious 
attainment of [NAAQS]" and will not "delay timely attain-
ment of any [NAAQS]," as section 7506(c)(1) requires. 42 
U.S.C. s 7506(c)(1)(A), (c)(1)(B)(iii). We think that petitioner 


has adequately challenged EPA's regulation under section 
7506(c)(1).

 The legislative history of the 1990 conformity requirements 
provides one final reason why we think the phrase "conform-
ing plan and program" refers to currently conforming plans 
and programs. Congress imposed new conformity require-
ments in order to integrate transportation planning at the 
local level with attainment and maintenance of air quality 
standards at the state level. See Clean Air Conference 
Report, 136 Cong. Rec. at 13,106 col.1 (noting that the statute 
"will require transportation planning agencies to view their 
task as the development of a transportation system that 
meets ... both mobility needs and air quality objectives"). 
By requiring plans and programs to conform to applicable 
SIPs at the time of project approval, Congress sought to 
ensure that "transportation plans and programs [would] serve 
as part of the pollution control strategy for the metropolitan 
area." Id. To be sure, plans and programs could also serve 
this pollution control function, as EPA explains, by "ac-
count[ing] for and offset[ting] if necessary the emissions of 
any non-federal projects that are implemented during a con-
formity lapse." 62 Fed. Reg. at 43,790 col.1. But that 
approach would invite local decision-makers to approve trans-
portation projects while deferring development of pollution 
control strategies during conformity lapses, thereby subvert-
ing Congress's intent that the two processes--transportation 
planning and pollution control--occur simultaneously. See 
136 Cong. Rec. at 36,107 col.2 (regional planning process 
should identify "the comprehensive transportation system for 
a metropolitan area" in the context of a "comprehensive 
consideration of alternatives ... and careful analysis of op-
tions that can contribute toward achieving the air quality 
objectives of the Clean Air Act").

 The Conference Report also describes section 7506(c)(2)(D) 
as an "exception"--indeed, it is the only exception--to the 
general rule of section 7506(c)(2)(C). Id. at 36,108 col.1. 
Under section 7506(c)(2)(D), an excluded project may go 
forward only if its expected emissions, together with the 
expected emissions from currently conforming plans and 


programs, do not exceed the emissions ceilings in the applica-
ble SIP. As we indicated earlier, both Congress and EPA 
interpret the word "conforming" in this provision to mean 
currently conforming. See supra at 9. Section 7506(c)(2)(D) 
thus shows that Congress wanted no transportation projects 
to proceed without assurance that they would not undermine 
attainment or maintenance of current air quality standards. 
Directly contravening this mandate, the Agency's rule allows 
local officials to approve transportation projects included in 
plans and programs that previously conformed but presently 
do not. See 40 C.F.R. s 93.121(a)(1). Because the conformi-
ty status of such projects bears no relation to current air 
quality attainment or maintenance goals, their approval car-
ries no guarantee that their emissions will neither violate 
current standards nor contribute to existing violations. In-
deed, in the preamble to the 1997 Final Rule, EPA admits--
without qualification and contrary to its position in this case--
that "projects cannot be approved if the plan and TIP have 
lapsed." 62 Fed. Reg. at 43,797 cols.1-2.

 EPA offers two additional justifications for its interpreta-
tion of section 7506(c)(2)(C). Neither survives scrutiny. 
First, the Agency points out that under a regulation effective 
since 1995, a certain category of transportation projects called 
transportation control measures ("TCMs") may proceed even 
in the absence of a currently conforming plan and program. 
See 40 C.F.R. s 93.114(b). According to the Agency, this 
exemption shows that section 7506(c)(2)(C) of the statute 
requires no currently conforming plan and program at the 
time of project approval. But we see no reason to extend the 
exemption for TCMs to ordinary transportation projects, 
since the former reduce pollution, see id. s 93.101, while the 
latter add to it. TCMs are "specifically identified and com-
mitted to in the applicable implementation plan," id., and 
exempted from the requirements of section 7506(c)(2)(C) be-
cause, as the Agency explained in the preamble to the 1995 
rule, "[b]y definition, a TCM in an approved SIP conforms to 
the SIP because it is contained in the SIP." 60 Fed. Reg. at 
57,180 col.2. This rationale has no applicability to non-TCM 

projects because such projects never appear in SIPs. See id. 
at 57,180 col.3.

 Second, the Agency argues that although the statute re-
quires plan and program conformity determinations at least 
once every three years, see 42 U.S.C. 7506(c)(4)(B)(ii), the 
statute contains no such requirement for project conformity 
determinations. Inferring from this that Congress intended 
project conformity to be determined not more than once, 
EPA maintains that a project included in a previously con-
forming plan and program retains its conformity status, even 
if conformity of that plan and program eventually lapses. We 
disagree. Although the statute suggests that Congress did 
not intend project conformity determinations to occur every 
three years, it does not follow that Congress intended project 
conformity determinations to occur only once. Based on our 
analysis above, we read the statute to require non-federally 
funded projects to follow the three-year conformity determi-
nation schedule applicable to transportation plans and pro-
grams up to the point of MPO approval. After MPO approv-
al, non-federally funded projects need undergo no further 
conformity determinations.

 In sum, the language and history of the statute's conformi-
ty requirements show that Congress intended transportation 
planning and air quality management to proceed in lock step. 
By allowing local approval of transportation projects in the 
absence of currently conforming plans and programs, the 
Agency's regulation undermines section 7506(c)(2)(C)'s crite-
ria for demonstrating conformity of regionally significant 
transportation projects to state-level air quality standards. 
Finding clear congressional intent and thus no need to pro-
ceed to Chevron's second step, we hold that section 
93.121(a)(1) of the regulations violates the Clean Air Act.

 III

 Next, petitioner challenges section 93.102(c)(1) of the regu-
lations, which provides that

 [p]rojects subject to this subpart for which the NEPA 
 process and a conformity determination have been com-

 pleted by DOT may proceed toward implementation 
 without further conformity determinations unless more 
 than three years have elapsed since the most recent 
 major step (NEPA process completion; start of final 
 design; acquisition of a significant portion of the right-of-
 way; or approval of the plans, specifications and esti-
 mates) occurred.

40 C.F.R. s 93.102(c)(1). Known as the "grandfather" rule, 
this section reflects the Agency's view that "there should only 
be one point in the transportation planning process at which a 
project-level conformity determination is necessary." 62 Fed. 
Reg. at 43,783 col.2. According to petitioner, this regulation, 
like the one discussed above, violates section 7506(c)(2)(C) of 
the statute because it allows transportation projects to re-
ceive federal funding in the absence of a currently conforming 
plan and program. Again, we agree.

 To understand how the "grandfather" rule works, consider 
the following hypothetical: In 1993, an MPO approves and 
adopts a regional highway project--for example, an urban 
beltway. At the time, the beltway is included in both a 
conforming plan and a conforming program. Three years 
later, in 1996, the conformity status of the plan and program 
lapses. In 1997, the MPO acquires a significant portion of 
the right-of-way for the beltway. Today, ready to start 
building, the MPO seeks funding from the Department of 
Transportation. EPA's "grandfather" rule would allow DOT 
to fund the beltway, since a "major step"--acquisition of 
right-of-way--occurred within the past three years. But 
section 7506(c)(2)(C)'s conformity requirement expressly pro-
hibits DOT from "approv[ing], accept[ing], or fund[ing]" the 
beltway unless it "comes from a conforming plan and pro-
gram." This means that no transportation project may re-
ceive federal funds in the absence of a currently conforming 
plan and program. See supra Part II. Therefore, to the 
extent that section 93.102(a)(1) of the regulations allows pro-
jects to receive federal funds during plan and program con-
formity lapses, it violates the Clean Air Act.


 Defending its "grandfather" rule, EPA cites Environmen-
tal Defense Fund, Inc. v. EPA, supra. But that case sus-
tained the "grandfather" rule only as a transition measure "to 
avoid immediate 'retroactive' implementation of the new 
[1990] conformity requirement which would impose a substan-
tial and unforeseen burden on federal projects that had 
already satisfied existing federal requirements [i.e., NEPA 
review]." 82 F.3d at 456. Nothing in that decision supports 
what the Agency has done here--forever exempting a project 
from further conformity determinations where the project's 
most recent conformity determination occurred more than 
three years ago and where a "major step" occurred within the 
past three years.

 While invalidating section 93.102(a)(1) with respect to fed-
erally funded projects, we note that the statute does not 
preclude the "grandfather" clause from applying to non-
federally funded projects. Although section 7506(c)(2)(C) of 
the statute prohibits MPO or DOT approval of non-federally 
funded projects during a plan and program conformity lapse, 
it nowhere prohibits implementation of such projects as long 
as their approval occurred prior to the conformity lapse.

 IV

 We turn finally to petitioner's challenge to those sections of 
the regulations that permit or require plan, program, and 
project conformity to be based on motor vehicle emissions 
budgets in SIP revisions that a state has submitted to EPA, 
but that EPA has not yet approved or has disapproved. See 
40 C.F.R. ss 93.118(e)(1), 93.120(a)(2), 93.124(b). Under 
these regulations, if EPA disapproves a submitted SIP revi-
sion without a "protective finding"--i.e., a determination that 
the submission "contains adopted control measures or written 
commitments to adopt enforceable control measures that fully 
satisfy the [relevant statutory] emissions reductions require-
ments," id. s 93.101--then "[d]uring the first 120 days follow-
ing [such] disapproval..., transportation plan, TIP, and pro-
ject conformity determinations shall be made using the motor 
vehicle emissions budget(s) in the disapproved control strate-


gy implementation plan." Id. s 93.120(a)(2). Emissions bud-
gets contained in a submitted SIP revision also guide con-
formity determinations when EPA makes no finding within 45 
days of submission regarding the adequacy of the budgets. 
See id. s 93.118(e)(1); see also id. s 93.124(b) (allowing con-
formity to be based on submitted but not-yet-approved SIP 
revisions). Submitted budgets, however, do not supersede 
emissions budgets in an approved SIP for the years covered 
by the SIP. See id. s 93.118(e)(1).

 Conceding that the Clean Air Act generally requires con-
formity to be evaluated against approved SIPs, the Agency 
argues that these regulations represent reasonable responses 
to statutory silence as to how conformity should be deter-
mined when no approved SIP exists or when the approved 
SIP contains no adequate motor vehicle emissions budget. 
We disagree. Although the statute nowhere explicitly dic-
tates how conformity should be determined under the circum-
stances EPA describes, any attempt by the Agency to fill 
these gaps must satisfy section 7506(c)(1)(B)'s generally appli-
cable conformity requirements. Where EPA disapproves a 
SIP revision without a protective finding, i.e., without deter-
mining that it contains adequate measures to reduce emis-
sions to statutorily required levels, see 40 C.F.R. 
s 93.120(a)(2), or where EPA fails to determine the adequacy 
of motor vehicle emissions budgets in a SIP revision within 45 
days of submission, see id. s 93.118(e)(1), there is no reason 
to believe that transportation plans and programs conforming 
to the submitted budgets "will not--(i) cause or contribute to 
any new violation of any standard in any area; (ii) increase 
the frequency or severity of any existing violation of any 
standard in any area; or (iii) delay timely attainment of any 
standard...." 42 U.S.C. s 7506(c)(1)(B). Indeed, nothing in 
the regulations requires MPOs to show that an area's project-
ed emissions would be lower if plans and programs conform-
ing to a submitted budget were implemented than if they 
were not. See 62 Fed. Reg. at 43,781 col.2 (noting that 
submitted budgets replaced "build/no-build test" as measure 
of conformity under Final Rule). Even if it were true that 
section 93.118(e) gives states an incentive to file emissions 

budgets conforming to law, see Dissenting Op. at 10, the 
regulation would still violate the statute by allowing conformi-
ty determinations to take effect where federal agencies and 
MPOs have not discharged their "affirmative responsibility" 
to provide an "assurance of conformity." 42 U.S.C. 
s 7506(c)(1). To be sure, section 93.118(e)(6) of the regula-
tions provides that "the MPO and DOT's conformity determi-
nations [based on unapproved or disapproved SIPs] will be 
deemed to be a statement that the MPO and DOT are not 
aware of any information that would indicate that emissions 
consistent with the motor vehicle emissions budget" would 
violate section 7506(c)(1)(B)'s conformity criteria. But how 
can an MPO or DOT satisfy its "affirmative responsibility" to 
provide an "assurance of conformity" through a "deemed" 
statement indicating mere ignorance of non-conformity? For 
these reasons, we grant petitioner's request that we remand 
sections 93.118(e)(1) and 93.120(a)(2) to EPA for further 
rulemaking to harmonize these regulations with section 
7506(c)(1)'s conformity requirements.

 Section 93.124(b) is also inconsistent with the Clean Air 
Act, but for a different reason. That provision reads:

 If an applicable implementation plan submitted before 
 November 24, 1993, demonstrates that emissions from all 
 sources will be less than the total emissions that would 
 be consistent with attainment and quantifies that "safety 
 margin," the State may submit an implementation plan 
 revision which assigns some or all of this safety margin 
 to highway and transit mobile sources for the purposes of 
 conformity. Such [a SIP] revision ... may be used for 
 the purposes of transportation conformity before it is 
 approved by EPA.

Id. s 93.124(b). Unlike sections 93.118(e)(1) and 93.120(a)(2), 
which apply when there is no applicable SIP or no SIP with 
an applicable emissions budget, section 93.124(b) applies when 
there is an applicable SIP--i.e., it does not purport to fill a 
statutory gap. While it may be true that plans and programs 
conforming to a SIP revision under section 93.124(b) "will not 


cause, worsen, or prolong violations of air quality standards," 
Dissenting Op. at 13, the statute nevertheless requires con-
formity determinations to be based on a SIP "approved or 
promulgated under section 7410 of this title" where such a 
SIP exists. 42 U.S.C. s 7506(c)(1); see also id. s 7506(c)(2) 
(requiring transportation plans, programs, and projects "to 
conform to any applicable implementation plan in effect under 
this chapter"). Indeed, EPA itself has said that it "does not 
believe that it is legal to allow a submitted SIP to supersede 
an approved SIP for years addressed by the approved SIP." 
62 Fed. Reg. at 43,783 col.3; see also 40 C.F.R. s 93.118(e)(1). 
Because section 93.124(b) would allow a submitted but unap-
proved SIP revision to supersede an approved SIP, it violates 
the Clean Air Act.

 V

 Our dissenting colleague charges that our conclusions today 
frustrate EPA's goal of allowing greater flexibility in the 
conformity determination process. See Dissenting Op. at 1. 
Whatever the Agency's policy goals, our job is to interpret 
the statute. Here, the statute imposes an elaborate array of 
requirements that, according to the dissent, amount to "a 
congressional effort to micromanage local transportation 
planning." Id. at 1. If this legislative scheme is too onerous, 
it is up to Congress to provide relief, not this court.

 We grant EDF's petition for review and hold that sections 
93.121(a)(1) and 93.102(c)(1) of EPA's regulations are unlawful 
because they depart from the criteria for demonstrating 
project conformity established in section 7506(c)(2)(C) of the 
Clean Air Act. In addition, we remand sections 93.118(e)(1) 
and 93.120(a)(2) of the regulations for the Agency to align 
these regulations with the general conformity criteria of 
section 7506(c)(1)(B). Finally, we hold that section 93.124(b) 
of the regulations violates section 7506(c)(1)-(2) of the Act by 
allowing a submitted SIP revision to supersede an approved 
or applicable SIP.

 So ordered.

 Williams, Circuit Judge, dissenting: The 1990 conformity 
amendments to the Clean Air Act ("CAA") were intended to 
harmonize the transportation planning process for polluted 
metropolitan areas with air quality plans (technically, "state 
implementation plans" or "SIPs") established by state author-
ities. In particular, the conformity amendments prohibit 
certain transportation activities from going forward unless 
relevant entities have determined that the activities are "in 
conformity"--that is, that they meet certain criteria relating 
to air quality. The Act's conformity requirements are aston-
ishingly confusing, and could if interpreted as stringently as 
possible seriously disrupt state and local transportation plan-
ning. That would "frustrate the process of state and federal 
cooperation and the integrated planning that section 176(c)(1) 
was created to foster." EDF v. EPA, 82 F.3d 451, 468 (D.C. 
Cir. 1996). The EPA attempted in this rule to reduce disrup-
tion and make the conformity determination process "more 
logical and feasible" 62 Fed. Reg. 43,780, 43,781 (1997), by 
allowing greater flexibility than it had permitted in its 1993 
conformity regulations. See 62 Fed. Reg. at 43,780. In 
accepting all the petitioners' challenges to the rule, the major-
ity undoes much of what EPA intended to accomplish. Al-
though I believe there are three respects in which the EPA 
has not adequately explained itself, I cannot find it guilty of 
the thoroughgoing misunderstanding of the statute that leads 
the majority to find for EDF on every issue. Accordingly, I 
dissent.

 Of course when a congressional effort to micromanage local 
transportation planning in as much detail as this statute is 
followed by a judicial decision that the agency must put states 
and localities in an even tighter straightjacket, one may feel 
that Congress asked for it. But one cannot say the same for 
the hapless citizens who must live with the results.

 I.Local approval of nonfederal projects not from currently 
 conforming plan and program

 The first regulation the majority strikes down is 40 CFR 
s 93.121(a)(1). It allows certain nonfederal entities to adopt 
or approve projects contained in the first three years of a 


transportation plan and program (i.e., designated for imple-
mentation within those years) that was once in conformity, 
even if conformity has since lapsed. I disagree with the 
majority here because I think the regulation reflects a rea-
sonable interpretation of 42 U.S.C. s 7506(c)(2)(C). That 
provision prohibits metropolitan planning organizations 
(known as "MPOs") and other recipients of federal funds 
from approving certain transportation projects, including 
those covered by the challenged regulation, unless the pro-
jects "come[ ] from a conforming plan and program." The 
majority holds that this phrase requires the projects in 
question to come from a plan and program that conforms at 
the time of approval.

 EPA argues that the phrase allows approval of any project 
that comes from a plan and program that conformed at one 
time, even if the approval is given after conformity has 
lapsed. The statutory text permits EPA's view, and the 
agency's interpretation is reasonable in light of its goal of 
protecting localities from disruption caused by conformity 
lapses, which appear frequently to be beyond local control. 
The Department of Transportation must redetermine the 
conformity of plans and programs every three years, and 
must also make a new conformity determination within 18 
months of EPA approval of a SIP revision that establishes or 
changes emissions budgets, among other circumstances. If 
the DOT fails to make the required determinations within the 
prescribed time frames, conformity will lapse. See 40 CFR 
ss 93.104(b)(3), 93.104(e).

 The majority argues that since the phrase "comes from a 
conforming plan and program" is in the present tense, its 
"ordinary meaning" is "comes from a currently conforming 
plan and program." Maj. Op. at 9. But that is too simple; 
the phrase is ambiguous. "Comes from X" can mean "has its 
origin in X," and when the phrase is used that way, the time 
for determining X's qualities can be the time of origination. 
A Belfaster who 10 years from now says he "comes from a 
bleeding land" will be understood--no matter how effective 
the recent peace accord. A layabout who says he "comes 

from a hard-working family" can be telling the truth even if 
all his relatives are dead.1

 The majority advances three arguments against EPA's 
interpretation here--one based on the use of the word "con-
forming" elsewhere in the statute, another on the require-
ments of another statutory provision dealing with conformity, 
and the third on the legislative history. None is persuasive.

 First, the majority appeals to the use of the word "con-
forming" as an adjective in s 7506(c)(2)(D). This argument 
starts with the decision that the "conforming" is used in that 
provision to mean "currently conforming." Next, the majori-
ty argues that since (c)(2)(D) and (c)(2)(C) provide alternate 
ways of determining project conformity, the term should be 
read to mean the same thing in each paragraph. Together, 
these propositions lead the majority to the conclusion that 
(c)(2)(C) also requires a "currently conforming" plan.

 The determination that (c)(2)(D) requires a "currently con-
forming" plan is surely contestable.2 But even if it is correct, 
it was reasonable for EPA to decide that this stricture did not 
carry over to (c)(2)(C). First, the provisions differ in lan-
__________
 1 It might be said that transportation projects do not "originate" 
in transportation plans or programs; projects in a plan may be 
more like stories in an anthology than chapters in a novel. But the 
hypothesis is not strong enough to give the phrase "comes from a 
conforming plan" the clear meaning that the majority finds. The 
statute establishing the federal transportation planning process 
prescribes the designation of MPOs to carry out a "continuing, 
cooperative, and comprehensive" planning process, 23 U.S.C. 
s 134(a), by developing plans and programs that contain the pro-
jects to be implemented, id. s 134(h)(2)(A). This language, if 
anything, suggests the novel metaphor more than the anthology; in 
any event, it cannot be said to establish the anthology metaphor 
with the clarity necessary for the majority's interpretation.
 2 The majority cites two pieces of evidence for its idea that the 
plan must be currently conforming, the Clean Air Conference 
Report and a statement by EPA. Assertions contained in the 
former document, despite what the majority says, are not interpre-
tations by "Congress," Maj. Op. at 12-13, but by committee draft-
spersons. With respect to the EPA's statement, even if the majori-
ty were correct that the agency has contradicted itself in its 
interpretations of (c)(2)(D) and (c)(2)(C), the existence of that 

guage: the former provision lacks the phrase "comes from," 
and has no other linguistic hook suggesting that one should 
look back to an earlier time of origin. Second, I find nothing 
"odd," Maj. Op. at 10, from a substantive point of view about 
the difference EPA's interpretation creates between the two 
ways of determining project conformity. Section 
7506(c)(2)(C) governs projects that were included in plans and 
programs that have gone through a conformity determination, 
while (c)(2)(D) governs projects that were never before con-
sidered in such a determination. In light of the intent of the 
Clean Air Act amendments to foster state-federal partner-
ship, it is not unreasonable for EPA to protect states' reliance 
interest where a project has already been considered in a 
conformity determination; no such reliance interest exists for 
projects that fall under (c)(2)(D).

 The majority next finds EPA's regulation flawed because it 
allows approval of projects that violate s 7506(c)(1), which 
defines conformity in general terms and applies to all federal 
activities, not just transportation-related ones. In its essence 
s 7506(c)(1) forbids federal activities that will cause, worsen, 
or prolong violations of air quality standards. It also forbids 
MPO approval of projects with such effects.

 The majority holds that because EPA's rule allows MPO 
approval of transportation projects from transportation plans 
that are not in conformity at the time of approval, it allows 
MPOs to approve projects that do not meet s 7506(c)(1)'s 
requirements and thus violates that section.

 In doing so, the majority embraces an argument that 
EDF's opening brief raised only in a novel and somewhat 
deceptive way. It mentioned the claim in two sentences of its 
"Summary of Argument," but not at all thereafter. See EDF 
Br. at 13. In its main argument, instead, EDF claimed that 
s 93.121 violated s 7506(c)(2). Its only argument from 
s 7506(c)(1) was a general one--that EPA should issue fur-

__________
contradiction tells us at most that one of the interpretations must 
be wrong--not that the EPA's reading of (c)(2)(D) must be right.

ther regulations implementing that provision; and on that 
subject it didn't mention s 93.121, although it gave examples 
of other regulations that in its view showed that the new 
conformity rule allowed violations of s 7506(c)(1). Unsurpris-
ingly, EPA did not respond to the (c)(1) argument.

 The majority argues that EDF did come through with an 
elaboration of its (c)(1) claim at pages 23-25 of its brief. But 
the referenced argument is quite distinct. It is based on a 
perceived tension between EPA's interpretation of (c)(2)(C) 
and another statutory provision, s 7506(c)(4). There is no 
explicit mention of (c)(1) in the passage, nor is there an 
implicit claim that EPA's interpretation violates (c)(1). In-
stead, the discussion elaborates on the supposed problems for 
EPA's interpretation created by s 7506(c)(4), which calls for 
periodic redetermination of the conformity of transportation 
plans and programs. EDF's heading says that the EPA's 
regulation "Eviscerates Congress' Decision to Set Time Lim-
its on Plan, TIP and Project Conformity," EDF Br. at 23, and 
the text goes on immediately to cite s 7506(c)(4), which 
indeed sets such time limits. Raising one argument is not an 
implicit raising of the other.

 The closest EDF comes to making the (c)(1) argument is its 
claim that EPA's interpretation allows regions to "continue 
implementing transportation systems designed to meet older 
emissions targets no longer adequate to attain the NAAQS." 
EDF Br. at 24. This sentence appears in the midst of the 
(c)(4) argument and is best read as an illustration of the 
alleged tension between that provision and EPA's regulation, 
not as raising a claim based on (c)(1). Though the sentence 
does contain the word "attainment," which also appears in 
(c)(1), there is no other textual reference to the statutory 
provision, and no implicit reference is obvious. A project 
does not violate the relevant provisions of (c)(1) unless it 
actually causes, worsens, or prolongs a violation of the 
NAAQS, or is not in "conformity to [the relevant SIP's] 
purpose of ... achieving expeditious attainment" of the 
NAAQS. It is by no means clear that progress toward 
targets that are "no longer adequate" fits into any of those 
categories. The vaguely drafted last category (requiring 


"conformity to [a plan's] purpose of ... achieving expeditious 
attainment") is the most likely candidate, but EDF never 
even hints at an explanation of how a purpose is thwarted by 
inadequate contribution to its realization. That judges are 
able to find a dim connection between EDF's argument and 
(c)(1)--after the fact--is hardly a showing that EDF raised a 
(c)(1) argument.

 In the interests of fairness to parties and avoidance of 
improvident decisions, we normally refuse to consider argu-
ments that are raised only in the reply brief. See, e.g., 
Doolin Sec. Sav. Bank v. OTS, 156 F.3d 190, 191 (D.C. Cir. 
1998). This rule also extends to arguments raised in only a 
conclusory fashion in the opening brief and not addressed by 
appellee. See Texas Rural Legal Aid, Inc. v. Legal Servs. 
Corp., 940 F.2d 685, 697-98 (D.C. Cir. 1991). The rule is 
especially compelling when the statutory and regulatory 
scheme presents as many opportunities for error as this one.

 In any event, even if the argument had been properly 
raised it should have been rejected. To understand why, we 
have to look at the overall structure of s 7506(c). Section 
7506(c)(1) is a general requirement covering federal activities. 
It forbids federal entities to engage in activities that do not 
conform to an applicable SIP and, in subparagraphs (A) and 
(B), gives a definition of conformity. Sections 7506(c)(2) and 
(3) both address transportation and provide rules for con-
formity determinations in that context. Section 7506(c)(3) 
establishes interim rules, and s 7506(c)(2) is the main trans-
portation conformity provision.

 The majority's opinion assumes that situations governed by 
(c)(2) are also governed by (c)(1). But the statute can 
reasonably be read to say that (c)(2) and (c)(3) govern exclu-
sively in their own domains. On this reading, s 93.121(a)(1), 
which governs a situation covered by (c)(2)(C), would not be 
subject to invalidation under (c)(1).

 The most obvious support for this reading comes from the 
fact that the specific transportation conformity requirements 
are not entirely consistent with the general conformity re-
quirements, so that applying (c)(1) to all situations governed 

by (c)(2) and (c)(3) produces contradiction. Section 7506(c)(3), 
for instance, provides that "conformity" of a plan "will be 
demonstrated" if the plan contributes to annual emissions 
reductions of ozone and carbon monoxide and meets certain 
other requirements not relevant here. See 
s 7506(c)(3)(A)(iii). Thus, a plan allowing activities that 
cause a violation of (for example) particulate matter stan-
dards is in conformity under (c)(3) as long as the other 
requirements are met. Not so under the general rules of 
(c)(1), since that provision forbids activities that cause viola-
tions of "any standard." See s 7506(c)(1)(B)(i). The 
transportation-specific (c)(3) rule triumphs in this conflict. 
Each statutory provision is normally presumed to serve a 
function; thus a specific provision governing a set of circum-
stances entirely within a more general one must, within its 
own scope, prevail over the more general. Otherwise it 
would be deprived of its function. Cf. Hemenway v. Peabody 
Coal Co., 159 F.3d 255, 264 (7th Cir. 1998) (noting that where 
the scope of one provision is not completely contained within 
the scope of the other it is impossible to call either "more 
specific"). That is the case here. Subsection (c)(1) nominally 
covers all federal activities, and (c)(3) covers only transporta-
tion activities, and those only for a limited time.

 Section 7506(c)(2)(A) also supports the view that the specif-
ic requirements replace the general ones. It requires a 
finding that a transportation plan or program "will conform to 
the requirements of [s 7506(c)(1)(B)]" before the plan or 
program can be found in conformity. The majority dubs my 
observation to this effect a "concession." Maj. Op. at 10. 
But since the issue here is what (c)(2)(C) requires, (c)(2)(A)'s 
specific imposition of the requirement makes clear that the 
draftsmen, contrary to the majority, understood that the 
generality of (c)(2) situations did not require compliance with 
(c)(1).

 Thus, it appears that it would be reasonable for EPA to 
find that (c)(1)'s requirements do not apply to situations 
governed by (c)(2) and (c)(3) except where specifically incor-
porated. There is no such specific incorporating language in 
(c)(2)(C), the transportation project conformity provision that 


governs here. I cannot find any assertion of this analysis in 
the record of the rulemaking, but as EDF did not properly 
raise the issue, EPA has had no real opportunity to explain 
its view of how (c)'s subsections relate to each other.

 Finally, the majority points to statements in the legislative 
history. In general these say that one purpose of the CAA 
amendments was to promote integration of the air quality and 
transportation planning processes, a proposition with which 
neither EPA nor anyone else has any quarrel. And the 
majority ends as it began, with an appeal to (c)(2)(D)'s 
purported requirement of a "currently conforming" plan. As 
I explained above, this stricture, if it exists, does not bind 
EPA in interpreting (c)(2)(C).

 Thus, Congress has not "directly addressed the precise 
question at issue" in this case, Chevron U.S.A. Inc. v. NRDC, 
467 U.S. 837, 843 (1984), so we must uphold the EPA's 
resolution of the statutory ambiguities if it is reasonable. 
And it is, given the Act's overall purpose to promote a 
cooperative regime of integrated planning.

 Although the EPA's treatment of non-federally funded 
projects seems to me reasonable as a matter of statutory 
interpretation, I have found nothing in the record adequately 
explaining its different treatment of federally and non-
federally funded projects. Under s 93.121(a)(1), a project 
that is not federally funded may be approved by an MPO as 
long as it comes from the first three years of a transportation 
plan that once was in conformity. But a federally funded 
project may not be approved unless there is a "currently 
conforming transportation plan and currently conforming TIP 
at the time of project approval." See 40 CFR s 93.114. 
Nothing in the statute appears to justify such a distinction, 
and EPA's only explanation for the disparate treatment ap-
pears to be that "the existence of a conforming plan and TIP 
is not necessary to facilitate the implementation of [nonfeder-
al] projects." 62 Fed. Reg. 43,780, 43,790 (1997). It is 
undisputed that nonfederal projects can be funded without a 
currently conforming plan and TIP in place, while federal 
projects cannot. 42 U.S.C. s 7506(c)(2) provides that "[n]o 


Federal agency may ... fund any ... project unless such ... 
project has been found to conform to any applicable imple-
mentation plan.... ", while no such restriction covers non-
federal projects. But EPA has not explained why that differ-
ence is relevant to the project approval, as to which the 
statutory requirements draw no evident distinction between 
federal and nonfederal contexts. Because the EPA may be 
able to explain the difference, and if not might adopt for 
federal projects the rule it has chosen for non-federal ones, 
and in order to avoid the disruption that would be caused by 
an interim change that might itself be changed, I would 
simply remand for further explanation. See A.L. Pharma, 
Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995).

 II.Grandfathering of federally funded projects unless three 
 years elapse between major steps

 40 CFR s 93.102(c)(1) provides that transportation projects 
that have been once determined to be in conformity may 
proceed toward completion without further conformity deter-
minations unless more than three years elapse between "ma-
jor steps" of the project. The majority invalidates this so-
called "grandfathering" provision on the basis of the same 
construction of the statute that leads it to invalidate 
s 93.121(a)(1)--its reading of the words "comes from a con-
forming plan and program" in s 7506(c)(2)(C)(i). For the 
reasons given in the preceding section, I disagree.

 III.Use of emissions budgets from unapproved/disapproved 
 SIP revisions and reallocation of safety margins

 The majority next addresses three regulations that allow 
conformity to be determined on the basis of emissions bud-
gets contained in SIP revisions that EPA has not approved, 
remanding two and vacating one. The first of these, 40 CFR 
s 93.118(e)(1), allows an MPO or DOT to show consistency 
with emissions budgets in unapproved SIP revisions in con-
formity determinations starting 45 days after submission of 
the revision. In short, anticipating that sometimes it will be 
unable to pass on proposed SIP revisions promptly, the 
agency provides for use of a second-best substitute after 45 
days.

 The majority's sole basis for remanding this provision is 
the proposition that the regulation is insufficient to ensure 
compliance with 42 U.S.C. s 7506(c)(1)(B), the government-
wide conformity requirements. The theory is faulty. Even if 
we assume that (c)(1) applies generally to transportation 
projects covered by ss 7506(c)(2) and (3) (contrary to my 
analysis in part I), s 93.118(e)(1) does not allow violations of 
(c)(1).3

 Section 7506(c)(1) makes it the "affirmative responsibility" 
of an agency engaging in or supporting a federal activity to 
assure that the activity does not cause, exacerbate, or prolong 
any violation of air quality standards. For various reasons 
s 93.118(e)(1) is adequate to ensure that the DOT (and 
MPOs) carry out this mandate when emissions budgets have 
been submitted but not yet approved. First, because EPA 
will approve SIP revisions only if the revised SIP, including 
the budgets, includes enforceable control measures to reach 
and maintain air quality standards by specified dates, see 42 
U.S.C. ss 7410(a)(1), (a)(2)(A), (k)(3), states have an incentive 
not to submit the "inflated emissions budget[s]" about which 
EDF is concerned. EDF Br. at 33. Furthermore, EPA's 
regulations require a public hearing and consultation between 
state, federal, and local agencies before the SIP revision can 
be submitted. See 62 Fed. Reg. 43,780, 43,781 (1997).

 Just as the substantive rules and procedural controls on 
SIP revisions create some probability that states will file 
emissions budgets conforming to law, s 93.118(e)(6) makes 
the MPOs and DOT a further screen. It provides that when 
conformity determinations are made under s 93.118(e)(1), 
"the MPO and DOT's conformity determinations will be 

__________
 3 The EPA argues that s 93.118(e)(1) covers a gap between 
(c)(2) and (c)(3). If so, then even if (c)(2) and (c)(3) preempt (c)(1) 
where they apply, (c)(1) might spring to life for areas left blank by 
them. On the other hand, (c)(2) and (c)(3) might preempt (c)(1)'s 
independent effect over the entire field of transportation, including 
any gaps. Because I find that s 93.118(e)(1) is sufficient to guard 
against violations of (c)(1), I need not reach that argument here.


deemed to be a statement that the MPO and DOT are not 
aware of any information that would indicate that emissions 
consistent with the motor vehicle emissions budget" would 
violate (c)(1). If an MPO or DOT official is legally deemed to 
be making such a statement, presumably he or she will be 
reasonably careful that its factual underpinnings are valid--
on pain, surely, of at least a bureaucratic black eye if later 
experience should falsify the implicit representations.

 Taken together, ss 93.118(e)(1) and (e)(6) establish a high 
probability that submitted emissions budgets meet the re-
quirements of (c)(1). And a decent probability is all that any 
system can assure: even the EPA might err in giving an 
approval. In light of the purpose of the Clean Air Act to 
"foster" a "process of state and federal cooperation," EDF v. 
EPA, 82 F.3d 451, 468 (D.C. Cir. 1996), and the procedures 
nurturing sound state decisionmaking, it is hardly unreason-
able for EPA to allow the implied representation of an MPO 
or DOT as fulfilling its "affirmative responsibility" to assure 
conformity.

 The majority emphasizes the fact that the MPO or DOT 
bears an "affirmative responsibility" to assure conformity. 
But "affirmative" can be used essentially as an intensifier that 
emphasizes the existence of a responsibility, rather than as a 
prescription of some means for its accomplishment. See, e.g., 
Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 538-39 
(1979); CBS v. DNC, 412 U.S. 94, 110-11 (1973).

 EDF's principal argument against s 93.118(e)(1)--not ad-
dressed by the majority--is that that the regulation illegally 
allows conformity determinations to be made on the basis of 
something other than the "applicable implementation plan," 
as required by s 7506(c)(2) or (c)(3), or an implementation 
plan that has been "approved," as required by s 7506(c)(1), 
because it allows a submitted SIP revision to be treated as 
approved before approval. This somewhat overstates the 
case. The regulation provides only that the emissions bud-
gets are to be used to determine conformity; neither the 
regulation nor EPA's comments state that the revision may 
be treated as approved. The potential problem with the 


regulation is that it does not provide a reasonable way of 
determining conformity with the "applicable," that is, exist-
ing, SIP--not that it illegally allows revisions to be treated as 
approved before they actually are. And the regulation does 
provide a reasonable basis for determining conformity with 
the applicable SIP, at least in some cases.

 Section 93.118(e)(1) applies only when the most recent 
approved SIP contains no motor vehicle emissions budgets. 
In the absence of emissions budgets, the only possible rele-
vant statutory provisions for finding conformity with the 
"applicable implementation plan" are ss 7506(c)(3), which 
governs an interim period that began with the passage of the 
CAA amendment, and (c)(1), which as I argued at 15 n.3 
above, may govern any gap between the end of the (c)(3) 
interim period and the approval of SIPs with emissions 
budgets. My conclusion above that ss 93.118(e)(1) and (e)(6) 
together provide a reasonable means of determining conform-
ity addresses any application of (c)(1).

 That leaves the possible application of (c)(3). EPA has 
included no requirement that the entity making the conformi-
ty finding consider the activity's consistency with (c)(3). So 
there may be a deficiency here. But it is not clear whether 
s 93.118(e)(1) and s 7506(c)(3) are ever in effect at the same 
time; some statements of EPA in the rulemaking suggest 
that the interim period (c)(3) covers is over before the emis-
sions budget submission that triggers s 93.118(e)(1) takes 
place. See 58 Fed. Reg. 62,188, 62,191/1 (1993) (stating that 
although the interim period lasts only until the "conformity 
SIP revisions are approved, EPA is extending the interim 
requirements until the control strategy SIPs [i.e., the SIPs 
with emissions budgets] are submitted"). Since no party has 
briefed the issue and the present record is insufficient to 
answer the question, I would remand the issue for further 
explanation.

 The next regulation that the majority remands, 40 CFR 
s 93.120(a)(2), allows use of emissions budgets in SIP revi-
sions that EPA has disapproved for 120 days after the 
disapproval. The majority rejects it on the same ground as 

s 93.118(e)(1)--failure to ensure compliance with (c)(1). I 
agree with the majority that if (c)(1) is applicable, 
s 93.120(a)(2) cannot be said to satisfy it. Unlike 
s 93.118(e)(1), this section cannot be defended as governing 
cases where there are reasonable guarantees that the permit-
ted transportation activities will not violate s 7506(c)(1); the 
budgets at issue have actually been rejected as inadequate. 
If (c)(3) is applicable to situations covered by s 93.120(a)(2), 
that section is likely violated as well; (c)(3)(A)(iii) requires 
plans and programs to "contribute to annual reductions" in 
ozone and carbon monoxide nonattainment areas, and there is 
no reason to believe that emissions budgets specifically disap-
proved without a protective finding meet that criterion. It is 
possible, however, that none of (c)(1), (2), or (3) apply. Per-
haps (c)(2) and (3) entirely preempt (c)(1) with respect to 
transportation and s 93.120(a)(2) applies only during a gap 
that may, as I explained above, exist between those two 
provisions. Although EPA argues that s 93.120(a)(2) exists 
in a statutory gap, its brief and rulemaking statements fail to 
explain just why such a gap exists. Thus, I would require 
further explanation of the statutory basis for this regulation 
as well.

 The last of the challenged regulations, 40 CFR s 93.124(b), 
applies to states with SIPs that indicate that emissions from 
all sources are less than the total emissions that would be 
consistent with attainment of air quality standards and that 
quantify that "safety margin." The regulation allows such 
states to submit a SIP revision that assigns some of the 
safety margin to transportation sources and to use the revi-
sion for conformity purposes before it is approved by EPA. 
The majority invalidates this provision for the same reason 
EDF argues the last two provisions should be invalidated--
the regulation violates the requirement that conformity deter-
minations be "based on a SIP 'approved or promulgated 
under section 7410 of this title.' " Maj. Op. at 19. Here, it 
seems clear that activities found in conformity on the basis of 
the "safety margin" will not cause, worsen, or prolong viola-
tions of air quality standards, and thus that they conform to 
the applicable implementation plan under s 7506(c)(1). EDF 


has given no reason to doubt this conclusion, or to believe 
that activities producing emissions within the "safety margin" 
violate s 7506(c)(3). Thus, as above, the regulation can rea-
sonably be read to authorize the "use" of the revision as a 
reasonable alternate means of finding conformity with the 
existing SIP, rather than an illegitimate means of premature-
ly amending one.

 I dissent.